**Dario George BONGA, Petitioner Appellant,**

v.

**STATE of Minnesota, Respondent.**

No. A08–1135.

Supreme Court of Minnesota.

May 28, 2009.

---

Lawrence Hammerling, Chief Appellate Public Defender, St. Paul, Minnesota; and Melissa Sheridan, Special Assistant Public Defender, Eagan, Minnesota, for appellant.

Lori Swanson, Attorney General, John B. Galus, Assistant Attorney General, St. Paul, Minnesota; and Thomas A. Pertler,

Carlton County Attorney, Carlton, Minnesota, for respondent.

## OPINION

ANDERSON, G. BARRY, Justice.

This is an appeal from an order summarily dismissing Dario George Bonga's petition for postconviction relief seeking to withdraw his guilty plea. We reverse the postconviction court and remand for further proceedings.

Bonga admitted the following facts during his guilty plea hearing. On the night of July 17, 1998, Bonga was a passenger in a car in Carlton County with Carlos San Miguel, DuWayne Johnson, and another man. Bonga became angry after San Miguel made a disparaging remark about a musician Bonga admired. Johnson stopped the car in Jay Cooke State Park and Bonga began punching San Miguel. Bonga and San Miguel both got out of the car and Bonga continued to hit San Miguel, at one point using a pair of handcuffs as brass knuckles. Bonga began to stab San Miguel, who fell to the ground. Bonga stabbed him with a screwdriver a total of 80 times in the chest, back, and throat. Bonga admitted that some of the stabs were designed to kill San Miguel. Following the murder, Bonga went through San Miguel's pockets and took his wallet and money. Bonga then instructed Johnson to hide San Miguel's body, and Johnson did so.

On September 2, 1998, a grand jury returned an indictment charging Bonga with first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2008); first-degree felony murder, Minn.Stat. § 609.185(a)(3) (2008); and second-degree intentional murder, Minn.Stat. § 609.19, subd. 1(1) (2008).

Three weeks before Bonga's scheduled trial date, Bonga filed a motion seeking permission to discharge his public defender and represent himself. After a hearing on Bonga's motion, the district court found that Bonga was competent to waive his right to counsel. The court granted Bonga's motion, discharged the public defender, and appointed the discharged public defender as standby counsel. The court also allowed Bonga an additional week to reconsider his demand to represent himself.

Four days later, on August 30, 1999, at Bonga's request, Bonga met with the Carlton County Chief Deputy Sheriff and confessed to killing San Miguel. Later that night, Bonga attempted suicide. Bonga's self-inflicted injuries were treated at a local hospital, and anti-depressant medication was also prescribed for Bonga.

The following morning, Bonga informed the district court that he wanted to plead guilty to first-degree premeditated murder. The court conducted a detailed inquiry of Bonga concerning his desire to plead guilty to first-degree murder and, in addition, asked Bonga multiple questions about his attempted suicide. Bonga acknowledged that anti-depressant medication had been prescribed to him but, at the time of his guilty plea, Bonga had not taken any of the anti-depressants. Standby counsel said he believed Bonga was depressed but aware of what was happening; standby counsel also stated he had no reason to doubt Bonga's competency to plead guilty knowingly, intelligently, and voluntarily.

Bonga was given several opportunities to talk to his standby counsel and did so on two occasions. On one of those occasions, Bonga also met with the prosecutor, and all three discussed the mens rea requirements for first-degree premeditated murder. While Bonga had initially expressed some hesitation about waiving his right to argue for conviction on lesser offenses, after this consultation, he elected to go

forward with the guilty plea. The district court accepted Bonga's guilty plea to first-degree premeditated murder and later sentenced Bonga to life imprisonment. Bonga did not file a direct appeal.

Two years later, in 2001, Bonga filed a pro se motion asking the district court to vacate, set aside, or correct his sentence pursuant to Minn. R.Crim. P. 27.03, subd. 9. The court denied the motion without a hearing. It appears, although the order does not specifically so state, that the district court treated Bonga's motion as a petition for postconviction relief. Bonga did not appeal.

In the current proceeding, Bonga, represented by counsel, filed a petition for postconviction relief in 2007, seeking to withdraw his guilty plea to first-degree murder. The court dismissed the petition without a hearing, characterizing the current action as a successive petition for postconviction relief.

## I.

On review from a summary denial of a petition for postconviction relief, " 'we examine whether sufficient evidence exists to support the district court's findings' " and will only reverse upon " 'proof that the postconviction court abused its discretion.' " *Powers v. State*, 695 N.W.2d 371, 374 (Minn.2005) (quoting *Ives v. State*, 655 N.W.2d 633, 635 (Minn.2003)). We review a postconviction court's findings of fact for an abuse of discretion and questions of law de novo. *Arredondo v. State*, 754 N.W.2d 566, 570 (Minn.2008) (citing *Leake v. State*, 737 N.W.2d 531, 535 (Minn. 2007)). Bonga argues that the postconviction court erred in dismissing his postconviction petition as a successive petition because either (1) his motion in 2001 was not a postconviction petition or (2) if it was, he was denied his right to counsel in a first review by postconviction proceeding and,

therefore, that proceeding was not a valid basis for summarily dismissing his second postconviction proceeding. The State argues that Bonga is barred from raising the same issues in this proceeding that he raised in connection with his 2001 motion. The State also argues that Bonga's claim is without merit and should be dismissed on that basis.

It is undisputed that Bonga's 2001 pro se filing with the district court was labeled as a Minn. R.Crim. P. 27.03, subd. 9, motion to correct the sentence imposed by the court. But while the district court acknowledged in its order that Bonga had made a motion under Rule 27.03, subd. 9, the court also appeared to treat the motion as a petition for postconviction relief, declining to hold a hearing on the basis of Minn.Stat. § 590.04, subd. 1 (2008) (allowing the court to decline to hold a hearing if the petition for postconviction relief and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief).

In 2007, Bonga, represented by counsel, filed a petition specifically seeking postconviction relief. The postconviction court summarily dismissed this petition because it had "previously heard and decided the issue of the Defendant's mental capacity at the time of his guilty plea." The postconviction court cited as authority Minn.Stat. § 590.04, subd. 3 (2008), which allows the postconviction court to "summarily deny a second or successive petition for similar relief on behalf of the same petitioner."

Although we do not decide if the postconviction court was correct in treating Bonga's 2001 motion as a petition for postconviction relief, we note the postconviction court's treatment of Bonga's motion as a petition for postconviction relief is consistent with our decision in *Powers v. State*, 731 N.W.2d 499, 501 n. 2 (Minn.

2007), and that Minn.Stat. § 590.01 (2008) is sufficiently broad to encompass a Minn. R.Crim. P. 27.03 motion. But once the postconviction court made the decision to treat the 2001 motion as a petition for postconviction proceeding, the court was required to, but did not, recognize that Bonga had the right to be represented by counsel. *See* Minn.Stat. § 590.05 (2002).[1] Bonga requested counsel for his 2001 motion; both parties agree that Bonga did not knowingly and intelligently waive his right to counsel. Bonga did not appeal the denial of his request for relief or the denial of counsel. But the United States Supreme Court has recognized that the denial of counsel is a structural error. *Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). And failure to appeal is not fatal to a subsequent petition where structural error is present. *See State v. Dorsey*, 701 N.W.2d 238, 252–53 (Minn.2005) (holding that the presence of a structural error precludes harmless-error analysis and requires reversal).

Here, because Bonga did not waive his right to counsel in the 2001 motion, it was an abuse of discretion for the postconviction court to rely on that proceeding in summarily dismissing the 2007 petition for postconviction relief. We reverse the order of the postconviction court and remand the matter to the postconviction court for proceedings consistent with our opinion. We have not considered, and do not express an opinion about, the merits of Bonga's claims, if any.

Reversed and remanded.

MEYER, Justice (concurring).

I concur with the majority's conclusion that the postconviction court's summary dismissal was an abuse of discretion that requires reversal and remand. However, I write separately to highlight my concern that the lawyers and the court in this case did not appropriately consider the serious implications that clinical depression can have on a defendant's competency.

A defendant has a due process right not to be tried or convicted of a criminal charge while he is incompetent. *State v. Bauer*, 310 Minn. 103, 114, 245 N.W.2d 848, 854–55 (1976) (citing *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975)). The law imposes a "protective duty" on the district court to make certain that the defendant is competent to stand trial. *Id.* at 108, 114 n. 7, 245 N.W.2d at 852, 855 n. 7; Minn.Stat. § 611.026 (2008). The district court has that same duty to a defendant who pleads guilty. *Godinez v. Moran*, 509 U.S. 389, 398–99, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). A defendant is incompetent to plead guilty if he "(1) lacks sufficient ability to consult with a reasonable degree of rational understanding with defense counsel; or (2) is mentally ill or mentally deficient so as to be incapable of understanding the proceedings or participating in the defense." Minn. R.Crim. P. 20.01, subd. 1.

If the district court finds that there is reason to doubt the defendant's competency, the court must suspend the criminal proceedings and appoint an examiner to examine and report on the defendant's mental condition. Minn. R.Crim. P. 20.01, subd. 2. Evidence of a defendant's irrational behavior, his demeanor during a court

---

1. Bonga made his motion in 2001, before the Minnesota Legislature passed the 2003 amendment to Minn.Stat. § 590.05 that this court held unconstitutional. *Deegan v. State*, 711 N.W.2d 89, 98 (Minn.2006) (holding that a defendant's right to assistance of counsel under the Minnesota Constitution extends to one review of a criminal conviction). Both parties agree that Bonga was entitled to counsel in the 2001 proceeding.

proceeding, and prior medical opinions on competency are relevant in determining whether there is reason to doubt a defendant's competence. *State v. Camacho,* 561 N.W.2d 160, 172 (Minn.1997) (citing *Drope,* 420 U.S. at 180, 95 S.Ct. 896). A decision on the need for further inquiry depends entirely on the surrounding circumstances; there are "no fixed or immutable signs" that indicate an answer to a question in which such "a wide range of manifestations and subtle nuances are implicated." *Drope,* 420 U.S. at 180, 95 S.Ct. 896. A defendant's demeanor during the proceedings on the record does not allow the court to ignore the defendant's history of irrational behavior. *See Pate v. Robinson,* 383 U.S. 375, 385–86, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) (although demeanor at trial was relevant, it could not be relied upon to dispense with a competency hearing; evidence of defendant's history of irrational behavior required further inquiry).

The question in front of the district court was whether a suicide attempt on the eve of a defendant's request to plead guilty triggered the court's "protective duty" to make certain the defendant was competent. Although some forms of depression would allow a defendant "to consult with a reasonable degree of rational understanding with defense counsel" or be capable of understanding and participating in the proceedings, Minn. R.Crim. P. 20.01, subd. 1, I assert that there are some forms of depression that would not.

The *Diagnostic and Statistical Manual of Mental Disorders,* a manual that provides diagnostic criteria for mental disorders, contains a category of disorders called "mood disorders." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 345 (4th ed., text rev. 2000) (DSM–IV–TR). This category contains a range of mental illnesses, but is most commonly used to refer to either "unipolar" or "bipolar" depression. *Id.*

These mood disorders are diagnosed based on the occurrence of episodes. A Major Depressive Episode, summarily, is a period of at least two weeks when an individual has a depressed mood or the loss of interest in nearly all activities. DSM–IV–TR, *supra,* at 349. The individual must also experience other symptoms, such as changes in appetite or sleep, decreased energy, difficulty concentrating, or recurrent thoughts of death or suicide. *Id.* A person is diagnosed with unipolar depression, also termed Major Depressive Disorder by the DSM–IV, if that person experiences one or more Major Depressive Episodes and at least four additional depression symptoms. *Id.* at 345. Unipolar depression and its symptoms appear to be those most commonly associated with the term "depression."

But depression may also incorporate manic episodes. A Manic Episode is "a distinct period during which there is an abnormally and persistently elevated, expansive, or irritable mood" for at least one week. *Id.* at 357. The individual also experiences symptoms such as inflated self-esteem, a decreased need for sleep, excessive involvement in pleasurable activities, and poor judgment. *Id.* Bipolar depression is characterized by the occurrence of one or more Manic Episodes and often one or more Major Depressive Episodes. *Id.* at 382. There are varying degrees of Manic Episodes, resulting in different diagnoses of bipolar depression. *Id.* at 361, 387 (distinguishing between Bipolar I Disorder and Bipolar II Disorder based on the less severe type of manic episode, a Hypomanic Episode, experienced by those with Bipolar II). Bipolar I Disorder can be severe enough to include symptoms of psychosis, such as hallucinations and delusional beliefs; such individuals "may be-

come physically assaultive or suicidal." *Id.* at 358–59.

The effect of these depression diagnoses depends on the severity of the individual's symptoms. Some manifestations of these disorders have a short duration, or have only minor effects on an individual's thought process. *See* DSM–IV–TR, *supra,* at 412. However, as the severity of symptoms increases, and as manifestations continue to persist, the defendant's ability for rational understanding or decision-making could be implicated. Severe depressive episodes could so affect a person's appreciation of consequences that the person has no motivation to protect his or her own self-interest. *See* Terry A. Maroney, *Emotional Competence, "Rational Understanding," and the Criminal Defendant,* 43 Am.Crim. L.Rev. 1375, 1411 (2006). Mania can cause a person to overestimate his or her personal abilities, and thus, chances of success; further, people experiencing mania are more prone to impulsive and risky choices. *Id.* at 1412. Most notably, though, is the fact that both types of depression can greatly alter an individual's perception of reality; depressive episodes can be so severe as to incorporate delusions and hallucinations and, as noted above, forms of Bipolar I Disorder can be accompanied by psychosis. *See id.* at 1410–11. Suicide attempts can signal a severe form of either type of depression.

My point in writing is to bring awareness to the wide range of effects that depression could have on a defendant's ability to "consult with a reasonable degree of rational understanding with defense counsel." Minn. R.Crim. P. 20.01, subd. 1. Normal or "only depressed" demeanor at a hearing should not end the inquiry into competency. The standard for requiring further inquiry is whether there is "reason to doubt the defendant's competency." *Id.,* subd. 2. Recent irrational behavior, such as a serious suicide attempt, requires thoughtful, careful consideration about whether further evaluation is needed to determine a defendant's competency.

ANDERSON, PAUL H., Justice (concurring).

I join in the concurrence of Justice Meyer.